IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| J.D., *et al*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>BENJAMIN PRICE, *et al*,<br><br>    *Defendants*. | Civil Action No. 2:20-cv-749<br><br>Hon. William S. Stickman IV |

**OPINION**

William S. Stickman IV, United States District Judge

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of events that occurred on May 20, 2018, aboard Delta Air Lines Flight 1860 ("Flight") from Pittsburgh International Airport to Hartsfield-Jackson Atlanta International Airport. According to the facts presented to the Court at the summary judgment stage, Defendant Benjamin Price ("Price") was seated in seat 13A next to Plaintiff J.D. ("J.D."),[1] who was in seat 13B. (ECF No. 79, p. 1); (ECF No. 84, p. 5); (ECF No. 86, p. 7). Prior to boarding the Flight, Price visited the TGI Fridays located in the Pittsburgh International Airport, which was owned and operated by Host and HMSHost. (ECF No. 79, p. 2); (ECF No. 84, p. 1); (ECF No. 86, p. 1). Over the course of approximately two hours, he ordered two 20-ounce Stella Artois beers and three two-ounce shots of 80 proof Crown Royal whiskey. (ECF No. 79, p. 21); (ECF No. 84, p. 1); (ECF No. 86, p. 1). Upon leaving TGI Fridays, the bartender who was

---

[1] J.D. was traveling on official government duty in her capacity as an armed law enforcement officer. (ECF No. 67, p. 9). Her function as a law enforcement officer aboard the aircraft was to protect the cockpit, and she was not permitted to interfere with passengers unless requested to do so by the crew. (ECF No. 79, p. 24); (ECF No. 84, p. 7); (ECF No. 86, p. 9).

1

waiting on Price gave him an additional smaller Styrofoam to-go cup that was filled with Crown Royal whiskey. (ECF No. 79, p. 22); (ECF No. 84, p. 2); (ECF No. 86, p. 3).

Price was the last person to board the Flight, and J.D. noticed he was "unstable," staggering, grabbing a hold of other passengers' seats to prevent himself from falling over, had a strong odor of alcohol, had red and glassy eyes, and had issues buckling his seat belt. (ECF No. 79, pp. 22, 24); (ECF No. 84, pp. 3, 5-6); (ECF No. 86, pp. 4, 7). The Flight left the gate at 3:39 p.m. (ECF No. 79, p. 22); (ECF No. 84, p. 3); (ECF No. 86, p. 4). Price "passed out" after getting situated. Approximately ten minutes prior to descent, Price woke up and cupped J.D.'s vagina. He then placed his hand on the inside of J.D.'s thigh and rubbed down her thigh.[2] (ECF No. 79, p. 25); (ECF No. 84, p. 8); (ECF No. 86, pp. 9-10). J.D. took hold of Price's wrist for the remainder of the flight, which landed in Atlanta at 5:22 p.m. She requested assistance in arresting Price from Delta employees and the Atlanta Police Department, and she held him on the plane until the other passengers disembarked. (ECF No. 79, p. 25); (ECF No. 84, pp. 8-10); (ECF No. 86, pp. 10-11). Price exited the Flight and was placed under arrest for public drunkenness.[3] (ECF No. 79, p. 26); (ECF No. 84, pp. 10-11); (ECF No. 86, p. 13).

Plaintiffs commenced a civil action against Defendants in the Court of Common Pleas of Allegheny County, Pennsylvania, with the filing of a Complaint on January 6, 2020, an Amended Complaint on February 13, 2020, and a Second Amended Complaint on April 24,

---

[2] Price pleaded guilty to assaulting J.D. on board the Flight pursuant to 18 U.S.C. § 113(a)(5) and 49 U.S.C. § 46506(1) at Case Number 1:19-CR-532-CCB in the United States District Court for the Northern District of Georgia. (ECF No. 81-17, p. 2).

[3] Price pleaded *nolo contendere* to public drunkenness at Case Number 2018CR04838 in the State Court of Clayton County, State of Georgia. (ECF No. 81-16, p. 2).

2020.[4] (ECF No. 1). Defendants Host International, Inc. and HMSHost Corporation removed the case to this Court on May 22, 2020. (ECF No. 1). The case proceeded through discovery, and on November 3, 2021, the Court denied the summary judgment motions of Defendant Delta Air Lines, Inc. and Defendants HMSHost Corporation and HMS Host International, Inc. (ECF Nos. 91 and 92). That same day, a pretrial order was issued setting jury selection and trial for September 19, 2022, at 9:30 a.m. in Courtroom 8B, 8th Floor, Joseph F. Weis Jr. U.S. Courthouse, 700 Grant Street, Pittsburgh, Pennsylvania. (ECF No. 93).

On July 22, 2022, fifty-nine days before trial is set to commence, Plaintiffs filed a Motion in Limine to Permit Live Testimony by Video at Trial. (ECF No. 114). They want permission for the following witnesses to testify by video:

1. Out-of-State Medical Providers:

    a. Marion Alston, DNP, a treating nurse practitioner of J.D., located in Brunswick, Georgia.

    b. Virginia Holm, LCSW, a treating mental health therapist of J.D., located in Brunswick, Georgia.

2. Detective Nicholas Deaton, who observed and arrested Price for public drunkenness on May 20, 2018, in Clayton County, Georgia, located in the state of Georgia.

3. Delta Air Lines, Inc. Employees, including Flight Attendants, Red Coats, and Pilots:

    a. Dequavius Baker was a Flight Attendant on Flight 1860 on May 20, 2018, and he resides in Atlanta, Georgia.

---

[4] Plaintiffs' Complaint alleges a violation of Pennsylvania's Dram Shop Act, 47 P.S. § 4-493. Their claims include negligence *per se* against Host International, Inc. ("Host") and HMSHost Corporation ("HMSHost") at Counts VII and VIII, as well as claims of negligence and negligent infliction of emotional distress against Delta Air Lines, Inc. ("Delta") at Counts IV and V. The Complaint also alleges loss of consortium against Host, HMSHost and Delta at Count IX. (ECF No. 22, pp. 9-20).

    b. Jan Burton was a Gate Agent at Flight 1860's arrival gate in Atlanta, Georgia on May 20, 2018, and he resides in Fairburn, Georgia.

    c. Bradford Frost was the First Officer on Flight 1860, and he resides in Mount Pleasant, South Carolina.

    d. Spencer Hutchinson was the Delta Red Coat, or security, in Atlanta on May 20, 2018, and he resides in Union City, Georgia.

    e. Captain James McKenzie, III was the Pilot-in-Command of Flight 1860, and he resides in Nashville, Tennessee.

    f. Suzan Shaw was a Flight Attendant on Flight 1860, and he resides in Winter Park, Florida.

    g. Juavesha Stephens was a Flight Attendant on Flight 1860, and he resides in McDonough, Georgia.

4. Dr. Harvey Rosen, PhD. Dr. Rosen is a retained expert of the Plaintiffs, and an economist. Dr. Rosen is located in Cleveland, Ohio. Plaintiffs represent that Dr. Rosen is immunocompromised, and must take precautions against contracting COVID-19 and other communicable diseases.

(ECF No. 114, pp. 2-3).

Plaintiffs contend that these witnesses should testify by videoconferencing because of (1) circumstances surrounding the COVID-19 pandemic, and (2) their out-of-state residences. (*Id.* at 7-9). Plaintiffs assert that Dr. Harvey Rosen is an immunocompromised individual who should be permitted to testify remotely. As to the other doctors, Detective Nicholas Deaton and the various Delta employees, Plaintiffs claim that testifying live in Pittsburgh, away from their home state, would be disruptive to the witnesses' work schedules and duties.

Defendants vehemently oppose Plaintiffs' motion. (ECF No. 116). They accurately note:

> Plaintiffs' claims arise out of alleged injuries sustained on May 20, 2018, during a flight from Pittsburgh International Airport to Atlanta, Georgia. Plaintiffs were at that time and remain residents of the state of Georgia. The investigation surrounding the alleged incident took place in Georgia. Plaintiff J.D.'s medical

4

treatment for her alleged injuries took place in Georgia--and yet, plaintiffs chose the Commonwealth of Pennsylvania as the forum for their lawsuit.

(ECF No. 116, p. 1). As to Marion Alston, Virginia Holm, and Detective Nicholas Deaton, all of whom reside in the state of Georgia, Defendants argue that Plaintiffs knew they would be calling these witnesses for at least two years and their proffered reason—inconvenience—is insufficient. (ECF No. 116, p. 2). As to Dr. Harvey Rosen, Defendants note that Plaintiffs chose him as their expert and make no offer of proof via affidavit or otherwise as to why and how he is immunocompromised or "why precautions cannot be taken to allow him to testify live at trial." (ECF No. 116, p. 2). And, as explained above, as to the Delta employees, Defendants assert Plaintiffs' request is baseless, as they have been informed that "Delta Airlines will make these employee witnesses available for live testimony at trial . . . ." (ECF No. 116, p. 3 n.1).

## II. ANALYSIS

### A. In-person testimony is a strong default under Rule 43.

Federal Rule of Civil Procedure 43(a) ("Rule 43(a)"), entitled "Taking Testimony," states, in pertinent part:

> **(a) In Open Court.** At trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise. ***For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location***.

Fed. R. Civ. P. 43(a) (emphasis added). The plain language of Rule 43 establishes that live testimony in open court is a deeply entrenched default that will only be excused when three factors are met—good cause, compelling circumstances, and appropriate safeguards.

The Advisory Committee Notes speak at length to the principle that in-person testimony is strongly favored and that remote testimony should properly be reserved for the most compelling and unforeseen situations:

> Contemporaneous transmission of testimony from a different location is permitted only in showing good cause in compelling circumstances. *The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truth telling. The opportunity to judge the demeanor of the witness face-to-face is accorded great value in our tradition. Transmission cannot be justified merely by showing that it is inconvenient for the witness to attend trial.*
>
> *The most persuasive showings of good cause and compelling circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident or illness, but remains able to testify from a different place.* Contemporaneous transmission may be better than an attempt to reschedule the trial, particularly if there is a risk that other—and perhaps more important—witnesses might not be available at a later time.
>
> Other possible justifications for remote transmission must be approached cautiously. Ordinarily depositions, including video depositions, provide a superior means of securing the testimony of a witness who is beyond the reach of a trial subpoena, or of resolving difficulties in scheduling a trial that can be attended by all witnesses. Deposition procedures ensure the opportunity of all parties to be represented while the witness is testifying. An unforeseen need for the testimony of a remote witness that arises during trial, however, may establish good cause and compelling circumstances. Justification is particularly likely if the need arises from the interjection of new issues during trial or from the unexpected inability to present testimony as planned from a different witness.
>
> Good cause and compelling circumstances may be established with relative ease if all parties agree that testimony should be presented by transmission. The court is not bound by a stipulation, however, and can insist on live testimony. Rejection of the parties' agreement will be influenced, among other factors, by the apparent importance of the testimony in the full context of the trial.
>
> *A party who could reasonably foresee the circumstances offered to justify transmission of testimony will have special difficulty in showing good cause and the compelling nature of the circumstances.* Notice of a desire to transmit testimony from a different location should be given as soon as the reasons are known, to enable other parties to arrange a deposition, or to secure an advance ruling on transmission so as to know whether to prepare to be present with the witness while testifying.

Fed. R. Civ. P. 43(a) advisory committee's note to 1996 amendment (emphasis added).

Courts interpreting Rule 43(a) have also recognized that in-person proceedings are strongly favored. *See, e.g.*, *Draper v. Rosario*, 836 F.3d 1072, 1081-82 (9th Cir. 2016); *Perotti v. Quinones*, 790 F.3d 712, 723 (7th Cir. 2015); *United States v. Lawrence*, 248 F.3d 300, 304 (4th Cir. 2001). The United States Court of Appeals for the Seventh Circuit observed:

> Videoconference proceedings have their shortcomings. "[V]irtual reality is rarely a substitute for actual presence and . . . even in an age of advancing technology, watching an event on the screen remains less than the complete equivalent of actually attending it." *United States v. Lawrence*, 248 F.3d 300, 304 (4th Cir. 2001). "The immediacy of a living person is lost" with video technology. *Stoner v. Sowders*, 997 F.2d 209, 213 (6th Cir.1993). As the court in *Edwards v. Logan*, 38 F. Supp. 2d 463 (W.D.Va. 1999), observed, "Video conferencing . . . is not the same as actual presence, and it is to be expected that the ability to observe demeanor, central to the fact-finding process, may be lessened in a particular case by video conferencing. This may be particularly detrimental where it is a party to the case who is participating by video conferencing, since personal impression may be a crucial factor in persuasion." 38 F. Supp. 2d at 467.

*Perotti*, 790 F.3d at 723-24.

There is no question that upon the advent of the COVID-19 pandemic courts turned to video testimony as a means of keeping the courts operating when much of society was shut down. Even as society returned to normalcy, courts have permitted the use of video technology in proceedings where warranted by the circumstances. Nevertheless, in this Court's assessment, the increased use of technology has demonstrated quite clearly why in-person proceedings are the strong default. It has also highlighted the inadequacies inherent in video proceedings. While video testimony may be an acceptable substitute in extraordinary circumstances, it is not the equivalent of, or comparable to, in-person testimony.

Experience over the last two-and-a-half years has demonstrated that, while comparatively more advanced than in the past, video technology still presents technological problems that can be distracting or even disruptive. The transition from in-person to video testimony has not been

seamless. Screens freeze, audio garbles, and feedback screeches proceedings to a halt. The video feed drops, interrupting a witness mid-word or leaving a disembodied stream of words coming from a shadow avatar on a blank screen. All of these issues take time to resolve, prolonging the proceedings. As a result, in a jury trial, the perceived convenience of video testimony would be underwritten by the jurors' valuable time.

In addition, expanded use of video technology has confirmed the observation of the cases cited in *Perotti* and of the Advisory Committee that "the opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition" and "the ability to observe demeanor, central to the fact-finding process, may be lessened in a particular case by video conferencing." In-person testimony impacts both the factfinder's ability to size up a witness—how she answers a question, body language, demeanor, etc.—and, potentially, the witness's testimony itself. Placing a witness on the stand, mere feet from judge and jury and face to face with an opposing attorney, allows the jury to fully observe how a witness reacts in the crucible of cross examination which is, as John Henry Wigmore noted, "beyond any doubt the greatest legal engine ever invented for the discovery of truth." *United States v. Salerno*, 505 U.S. 317, 328 (1992) (Stevens, J, dissenting) (citing 5 J. Wigmore, Evidence § 1367 (1974)). A witness has a very different experience testifying, even on cross examination, by speaking into a camera from the comfort of his or her home or office.

The Advisory Committee also aptly recognized that "[t]he very ceremony of trial" aids in the truth telling and truth discovering process. The majesty of the law is not dependent upon the trappings of a federal courtroom, but there is no question that it is fostered by such an august setting. This stands in stark contrast to the perceived casual atmosphere of video proceedings and corresponding behavior that it has engendered. Since the increased use of video technology

in 2020, this Court alone has encountered instances of participants eating, drinking, smoking, getting dressed, and going to the bathroom. This is in addition to other distractions, such as unusual filters, pets, ringing telephones, loud televisions, passers-by, and unconventional settings for court proceedings—such as cars, porches, backyards, and the neighborhood coffee shop.

While, as Plaintiffs' motion observes, the pandemic led to the greatly increased use of video testimony, it cannot be maintained that video testimony has become the norm or should be routinely employed on a going-forward basis. Video testimony is not a practical equivalent to in-person testimony. Nor has its expanded use rendered it legally equivalent. Rather, as the plain language of Rule 43(a) provides, "[a]t trial, the witnesses' testimony **must** be taken in open court . . . ." Fed. R. Civ. P. 43(a) (emphasis added). The presumption of in-person testimony will be overcome only upon a showing of "good cause in compelling circumstances and with appropriate safeguards." *Id.* The Court must, therefore, examine whether Plaintiffs have met this burden.

### B. Plaintiffs have not demonstrated good cause in compelling circumstances to permit video testimony of the witnesses identified in their Motion in Limine.

The Court will first determine whether the on-going presence of COVID-19, alone, is sufficient to constitute "good cause in compelling circumstances" so as to warrant permission for the eleven witnesses identified by Plaintiffs to testify remotely. Plaintiffs argue that "throughout the pandemic, courts have held that circumstances surrounding the pandemic constituted good cause for permitting remote testimony." (ECF No. 114, p. 6) (citing *Martinez v. Cont'l Tire the Ams., LLC*, 2022 WL 2290597, at *1-2 (D.N.M. June 24, 2022)). They appear to argue that the existence of COVID-19, alone, is a showing of good cause and compelling circumstances that would be sufficient to permit video testimony. It is perhaps for that reason that they make no

9

pandemic-related arguments or showings of specific cause for any of the witnesses except for Dr. Rosen, whom they represent is immunocompromised. Defendants counter that merely pointing to the presence of COVID-19 is not sufficient to overcome the strong preference of in-person testimony set forth in Rule 43(a). The Court agrees with Defendants.

The world, the country, and the Court are not in the same position as in early 2020 when video technology first came into use in response to the pandemic. At that time, it was reasonable for courts to treat the pandemic, without more, as good cause and compelling circumstances for the use of video testimony. Much of the country was in lock down and the risks associated with COVID-19 in the community were still unknown. The Commonwealth of Pennsylvania—like most states—was in a state of emergency. Now, much has changed. The state of emergency has long since been lifted in the Commonwealth and in other states. Vaccines, therapeutics, and other treatments are available. The prevailing COVID-19 variants, while likely more contagious, are considerably less dangerous. Much, if not most, of society has returned to normal, reconciling itself to the fact that the novel coronavirus has become one of the many viruses that circulate in endemic cycles. There is no reason to presume that court proceedings are more hazardous than the rest of our re-opened society. It is no longer reasonable, therefore, to treat the mere presence of COVID-19—without more—as the good cause and compelling circumstances necessary to permit video testimony.

Plaintiffs' arguments with respect to the two medical providers, the detective, and the Delta witnesses center on the fact that they all reside out of state and that it would be difficult and/or inconvenient for Plaintiffs and the witnesses to have them testify in person. But Plaintiffs chose this District as the forum for their action (having originally filed in Allegheny County). Rule 43(a) does not contemplate inconvenience or distance as alone constituting good cause and

compelling circumstances that would warrant video testimony. Plaintiffs have offered nothing remotely approximating the illustrative example of good cause and compelling circumstances described by the Advisory Committee, such as "when a witness is unable to attend trial for unexpected reasons, such as accident or illness, but remains able to testify from a different place."

The Advisory Committee also warned against delay in requesting leave to present testimony by video: "A party who could reasonably foresee the circumstances offered to justify transmission of testimony will have special difficulty in showing good cause and the compelling nature of the circumstances." Plaintiffs cannot reasonably argue that they did not know where these witnesses reside and/or work. They do not assert any late-breaking reasons rendering their presence at trial unusually inconvenient or impossible. They knew that trial was scheduled in this matter for months. Nevertheless, they waited until fifty-nine days before trial to file the instant Motion in Limine. This delay presents "special difficulty in showing good cause and the compelling nature of the circumstances."

With respect to the medical providers, the detective, and the Delta witnesses, Plaintiffs have presented the Court with no grounds to overcome the strong preference for in-person testimony. The Court will deny Plaintiffs' Motion in Limine with respect to these witnesses.

Dr. Rosen's situation requires a different analysis. Plaintiffs represent that he is their retained economics expert and is located in Cleveland, Ohio. They contend that he should be permitted to testify remotely because he "is immunocompromised, and must take precautions against contracting Covid-19 and other communicable diseases." Plaintiffs offer no details as to Dr. Rosen's condition or his regular regimen of precautions, if any. Nor do they support their motion with any declaration or statement of Dr. Rosen himself.

As explained above, the current state of the COVID-19 pandemic is such that merely asserting a concern for avoiding the virus, even for those with individualized risk factors, should not be enough—without a more detailed showing—to warrant remote testimony. The Court will, therefore, deny Plaintiffs' motion as to Dr. Rosen without prejudice to their right to file an amended motion setting forth specifics with respect to Dr. Rosen's condition(s), what precautions he takes to avoid COVID-19, and why testimony in this Court will present a risk greater than those encountered in Dr. Rosen's personal and professional affairs. The Court notes that Dr. Rosen is not a party. Nor is he an involuntary fact witness. Rather, he is an expert offering his services to Plaintiffs. The Court believes that Defendants have a presumptive right to cross examine Dr. Rosen in front of the jury. Nevertheless, to the extent that Plaintiffs can demonstrate that Dr. Rosen's condition is such that in-person testimony would pose a grave risk to Dr. Rosen *and* one which would be different than the conduct that he normally engages in as part of his regular personal and professional routine, the Court may find that good cause and compelling circumstances exist to rebut the presumption of in-person testimony and warrant remote participation.

### III. CONCLUSION

For the reasons set forth above, the Motion in Limine will be denied. Plaintiffs will be given leave to amend their Motion in Limine to make a more detailed showing as to Dr. Rosen within fourteen (14) days.

Dated: August 3, 2022                                BY THE COURT:

                                                     _____
                                                     WILLIAM S. STICKMAN IV
                                                     UNITED STATES DISTRICT JUDGE